**IN THE COURT OF APPEALS OF IOWA**

No. 14-2085
Filed July 27, 2016

**IN THE MATTER OF PROPERTY SEIZED**
**FROM GORDON DARNELLE WATT IV,**

**GORDON DARNELL WATT IV,**
**Appellant.**

_____

Appeal from the Iowa District Court for Pottawattamie County, Kathleen A. Kilnoski, Judge.

A claimant challenges the district court's order forfeiting currency seized during a traffic stop. **AFFIRMED**.

Nicholas A. Sarcone of Stowers & Sarcone, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

Gordon Watt appeals from the district court's order forfeiting $63,803 seized by law enforcement during a traffic stop and subsequent vehicle search. Watt argues the district court erred in finding the currency was subject to forfeiture under Iowa Code chapter 809A (2013) and in applying the presumption contained in section 809A.12(9). Because we find substantial evidence supporting the forfeiture order, we affirm.

## I.    Background Facts and Proceedings

On February 25, 2013, Watt was the front-seat passenger in a rented Lincoln MKX4 sports utility vehicle driven by Christopher Rucker from Evanston, Illinois, traveling westbound through Iowa. Pottawattamie County Deputy Sheriff Brian Miller was situated near the five-mile marker on Interstate 80 in Council Bluffs when his radar showed the Lincoln traveling seventy-eight miles-per-hour in the fifty-five miles-per-hour zone. Deputy Miller then stopped the vehicle and spoke to its occupants. While speaking to Watt and Rucker, Deputy Miller noticed the odor of marijuana coming from the vehicle. Deputy Miller confronted Watt about the marijuana odor and told Watt, based on the odor, he was going to search the vehicle. Watt then retrieved a small baggie of marijuana from the center console.

During the search, Deputy Miller found two duffle bags under a blanket in the rear cargo area of the vehicle. One of the duffle bags contained clothing, a black backpack, and a camouflage backpack. The camouflage backpack contained, among other items, Watt's wallet, a Samsung mobile phone, a small digital scale, a number of handwritten notes, $63,803 in United States currency

packaged in bundles and enclosed in plastic grocery bags, and a white pillowcase. The white pillowcase held a loaded Beretta handgun. Officers later learned the gun had been stolen from a home in Highland Park, a suburb near Evanston, Illinois, where Watt resided with his mother. The black backpack contained a computer and two magazines providing information on agricultural growing operations. Watt acknowledged the duffle bag and the two backpacks within the duffle bag belonged to him. Watt informed Deputy Miller he had family in Colorado and was moving there to train at high altitude, in an attempt to resume his professional basketball career. Rucker told Deputy Miller he was going to visit his girlfriend in Colorado.

On March 21, 2013, the State of Iowa filed an in rem forfeiture complaint seeking to forfeit the currency found in the vehicle. Watt answered, requesting the money be returned to him.

Before the district court considered the forfeiture action, Watt pleaded guilty to possession of marijuana (a serious misdemeanor punishable by six months in jail) and carrying a concealed weapon (an aggravated misdemeanor punishable by up to two years in prison). He requested, and was granted, deferred judgments on both counts.

On February 27, 2014, the district court began a hearing on the State's forfeiture petition. That day, Deputy Miller and three other officers testified on behalf of the State. Detective William Evans of Highland Park, Illinois, testified regarding the residential burglary during which the handgun found in Watt's backpack was stolen. His investigation led him to believe Rucker, now in prison on unrelated charges, had information about the Highland Park burglary.

Detective Miller testified, based on his conversation with Rucker, Miller believed Rucker and Watt were involved in illegal activity when they were stopped in Iowa.

Deputy Miller also testified, based upon his training and experience, he believed the loaded handgun, small amount of marijuana, and more than $63,000 in cash found in the vehicle—particularly when viewed in conjunction with the direction of the vehicle's travel—indicated Watt and Rucker were on their way to purchase drugs in Colorado to transport back to Illinois for sale. In Miller's words: "[C]urrency in this area runs westbound and narcotics run eastbound."

Detective Scott Halbrook of the Council Bluffs Police Department testified, based on his training and experience, he believed the notes found in Watt's backpack to be written documentation of drug-dealing activity. Detective Halbrook testified the notes resembled a ledger, commonly kept by drug dealers, which listed different types of marijuana and their prices, in addition to names Detective Halbrook believed to be customers.

When the forfeiture hearing resumed on June 6, 2014, Special Agent Michael Mittan testified regarding his experience in investigating drug trafficking following interdiction stops on Iowa's highways during his twenty-four years with the Iowa Division of Narcotics Enforcement. Related to this case, Special Agent Mittan testified that, because the state of Colorado has legalized marijuana possession, it is now a place where people go to buy plants or seeds. He testified he believed it was a felony to grow a certain number of marijuana plants in Colorado without a license. Special Agent Mittan also testified it is a federal felony to grow marijuana in Colorado regardless of licensure.

Over the objection of Watt's counsel, Agent Mittan testified it is illegal to transport marijuana from Colorado to Nebraska, Nebraska to Iowa, and Iowa to Illinois. He further testified drug possession would be a felony offense in those states depending on the amount of marijuana seized. Agent Mittan also testified drug dealers frequently use vehicles rented in the name of third parties to facilitate distribution and to avoid seizure of their own vehicle if they are stopped. The agent stated it is common for people involved in drug sales to carry loaded guns to protect their assets. Finally, Agent Mittan reviewed a document seized from Watt bearing what looked like quotations for what it would cost to start a marijuana growing operation.

When the forfeiture hearing resumed again on August 13, 2014, the State called Investigator Jason Lemaster of the Pottawattamie County Sherriff's Office, who heard Watt make this statement to the assistant county attorney as to why he possessed the loaded handgun: "Well, when you're carrying your life savings, you have to have a gun." Investigator Lemaster filed a report documenting the statement.

In his testimony, Watt denied saying he needed the gun for protection. Instead, he asserted the gun was in his bag because he "forgot it there from maybe a week or two before" when it was left in the backseat by "one of the youth in [his] community."

Watt testified the seized cash was from his professional basketball career. After playing basketball in college, in 2009 Watt entered the National Basketball Association draft but was not chosen to play on a team in the United States. Watt then played for several professional teams in Europe before returning to the

United States in April 2012. Watt received the last payment from European basketball in May 2012, approximately nine months before the traffic stop prompting the forfeiture proceedings. Records indicated Watt earned approximately $34,000 between September 2011 and May 2012. Watt testified he had few expenses while living in Europe due to the accommodations provided by the teams. Watt further testified he has had few expenses since his return to the states because his mother took care of the majority of his financial responsibilities. Watt claimed his limited expenses allowed him to save a significant amount of money. Watt noted previous fraudulent activity on his bank account prompted his mistrust in banks, and as a result, he generally withdrew earnings from his bank account upon deposit.

Watt testified he and Rucker were childhood friends. Watt acknowledged he had seen a report from the Illinois detective's interview with Rucker in which Rucker admitted, at the time of the traffic stop, the pair was going to Colorado to buy marijuana and bringing it back to sell in Illinois, as they had done in the past. But Watt testified the report's statements could not have come from Rucker "because all of that would have been false." Watt maintained the magazines and notes regarding marijuana cultivation reflected his effort to fit in with the Colorado culture. He engaged in the following exchange with the assistant county attorney:

> Q. It was all your own? A. Yes, me learning the industry. Typically when I step into any market, whether it is Sweden, France, anywhere, I want to know the main import, export, and me targeting Colorado because of the altitude and my training, I want to know what is going on in the community, I want to speak the language of the natives.

Q. So in February of 2013 you were going to Colorado to grow marijuana? A. I was going there to relocate and train.

Q. What about marijuana? You were not going to grow marijuana? A. No, I was not.

Q. Were you going there to set up a dispensary? A. No, but I wanted to—if I was next to somebody who had a dispensary, I wanted to be able to speak his language.

Watt traveled between Colorado and Illinois several times in the months before February 2013. Watt said he was trying to decide whether he wanted to move to Colorado. Watt flew into Denver on October 15, 2012. Watt rented hotel rooms in Colorado Springs from the nights of October 17-19, October 26-27, and October 29. Watt rented a car in Colorado Springs on October 23 and returned it on October 30. Subsequently, Watt was involved in a transaction in which a third individual rented other vehicles from Enterprise in Colorado Springs from October 30 to December 14. A high number of miles were put on these rental vehicles between October 30 and December 14 before they were returned in Colorado on December 14—the State noted one of the cars in particular could have made three round trips from Colorado Springs to Chicago. Later on December 14, Watt rented a car in Illinois. On December 18, Watt passed through Iowa, and he returned the rented vehicle the very next day. Watt also was involved in several car rental agreements originating in Illinois in January and February 2013.

Following the multiple-day hearing, the district court entered its order forfeiting the $63,803 in cash found in the vehicle. The court applied the presumption under Iowa Code section 809A.12(9), explaining, "Because the cash was found in close proximity to the contraband gun and marijuana, the State is entitled to a presumption that the money was proceeds of, or used to facilitate,

the illegal activity of drug trafficking . . . ." The court did not find Watt credible in his explanation for carrying so much cash, noting:

> His testimony and all of the evidence regarding his earnings as a basketball player simply did not account for his having that much cash, even if he had saved every dollar he had earned as a player. Watt's purported distrust of banks did not comport with his use of his bank card for many transactions.

The court then stated, even if Watt "is deemed to have rebutted the presumption that the cash is forfeitable," the State must still show a "substantial connection" between the seized currency and illegal activity. The court found the State's evidence established a substantial relationship between the seized currency and Watt's drug trafficking,[1] reasoning:

> Watt was a user of marijuana. He had an interest in legal marijuana cultivation in Colorado. He possessed photographs showing both cash and marijuana. He carried a scale with him when he traveled. He was in a rented vehicle traveling west with a large amount of cash to a state known for the presence of marijuana, a pattern consistent with drug trafficking. The reasonable inference from these facts is that Watt was engaged in drug trafficking and that the cash was to further that illegal activity.

The court concluded the State carried its burden by a preponderance of the evidence to show the seized currency was subject to forfeiture under section 809A.2.

Watt filed a motion to enlarge, alleging the State "failed to introduce any statute from any jurisdiction from which the trier of fact could conclude that the alleged conduct of Mr. Watt fit the elements of a crime punishable by more than one year in jail." In ruling on the motion, the district court made additional findings and conclusions. Among those findings, the court recounted officers'

---

[1] The district court concluded the State failed to demonstrate "any connection between the cash and alleged pimping or prostitution."

testimony that Watt had in his possession notes that appeared to be "logs detailing the amounts of money people owed Watt. The notes included references to names of different types of marijuana and amounts that the detectives opined indicated Watt was dealing in pounds of marijuana." The court further stated:

> The State did not ask the court to take judicial notice of drug trafficking statutes in Illinois or Colorado. However, transporting more than "personal use" marijuana would be punishable in Iowa for a year in jail or more, and would make this "conduct giving rise to forfeiture" under Iowa Code §809A.3(1)(b).

Watt filed a timely notice of appeal.

## II. Standard of Review

We review a forfeiture order for correction of errors at law. *In re Prop. Seized from Young*, 780 N.W.2d 726, 727 (Iowa 2010). Because forfeitures are disfavored under Iowa law, we strictly construe forfeiture statutes. *See In re Prop. Seized from Williams,* 676 N .W.2d 607, 612 (Iowa 2004).

## III. Analysis

### A. Sufficient Evidence

Under Iowa's "Forfeiture Reform Act," property is subject to forfeiture if it is "[u]sed or intended to be used in any manner or part to facilitate conduct giving rise to forfeiture" or constitutes "proceeds of conduct giving rise to forfeiture." Iowa Code § 809A.4(2)(a)(2), .4(3). "Conduct giving rise to forfeiture" includes:

> 1. An act or omission which is a public offense and which is a serious or aggravated misdemeanor or felony.
> 2. An act or omission occurring outside of this state, that would be punishable by confinement of one year or more in the place of occurrence and would be

> a serious or aggravated misdemeanor or felony if the act or omission occurred in this state.
>
> 3. An act or omission committed in furtherance of any act or omission described in subsection 1, which is a serious or aggravated misdemeanor or felony, including any inchoate or preparatory offense.

Iowa Code § 809A.3(1).

In this appeal, Watt disputes the district court's finding of sufficient evidence of conduct giving rise to forfeiture under section 809A.3. Watt claims the evidence supports only speculation as to his involvement in drug trafficking. Watt further contends the State failed to prove the punishment element of "conduct giving rise to forfeiture" by failing to submit into the record the specific statutes the State was alleging Watt violated.

To support the elements of conduct giving rise to forfeiture in this case, the State was required to demonstrate, by a preponderance of the evidence, Watt committed, or was going to commit, *either* (1) an act in Iowa which is an indictable offense; *or* (2) an act outside of Iowa punishable by confinement of one year or more in the state in which he committed the act and an indictable offense in Iowa; *and* (3) the seized currency was either the proceeds of or intended to facilitate the illegal activity. *See Id.* § 809A.3. Iowa Code section 809A.12(9) provides a presumption the third element is satisfied when money is found in "close proximity" to any contraband or an instrumentality of elements (1) or (2).

We find no error in the district court's determination the State met its burden to show by a preponderance of the evidence that the currency in Watt's backpack was subject to forfeiture. The officers testified, based upon their training and experience, Watt's travel patterns and items found in the vehicle—

including the large quantity of cash, loaded handgun, alleged drug notes, and multiple cell phones—are common indicators of drug trafficking. Deputy Miller testified Watt's possession of nearly $64,000 was consistent with the practice in drug-trafficking operations of currency traveling westbound while drugs travel eastbound.

Further, the record included evidence Rucker told police he and Watt were traveling to Colorado to purchase marijuana to bring back and sell in Evanston, Illinois, as they had done in the past. The State also pointed to the small amount of marijuana and digital scale in Watt's possession—though both are consistent with personal use, they support an inference Watt participates in illegal drug activity. The collective items in Watt's possession, law enforcment testimony as to drug-trafficking patterns, and Watt's lack of a credible explanation for the currency and loaded handgun in his possession support a reasonable inference Watt intended to use the cash for drug trafficking.[2] *See In re Prop. Seized from Thao*, No. 14-1936, 2016 WL 1130280, at *8 (Iowa Ct. App. Mar. 23, 2016) (noting expertise of officers may be considered when determining if State carried its burden and viewing the items found in the claimants' vehicle collectively).

Watt next claims, even if the district court could reasonably infer he was involved in multistate drug trafficking, the State did not present sufficient evidence to show Watt would have traveled back through Iowa while possessing the marijuana purchased in Colorado.

---

[2] Finding sufficient evidence to prove the currency was intended to be used to facilitate conduct giving rise to forfeiture, we need not address the alternative argument presented by the State that the currency was proceeds of illegal conduct. *See* Iowa Code § 809A.4(2).

The State presented evidence of several trips Watt made from Illinois to Colorado and back in the months leading up to the traffic stop. On at least one of these occasions, Watt stopped in Altoona, Iowa, as evidenced by a receipt. Furthermore, the most direct route from Illinois to Colorado runs through Iowa. The district court could reasonably infer Watt was involved in drug trafficking from Illinois to Colorado via highway travel. The conclusion Watt would return through Iowa logically follows and is supported by the State's evidence.

Watt further argues, even if we find the State sufficiently proved he intended to take part in drug trafficking in Iowa, the State did not meet its burden in proving "conduct giving rise to forfeiture" under section 809A.3. Watt's contention does not rest on an assertion that drug trafficking is not an indictable offense. Rather, he claims the State did not meet its burden because the district court did not take formal judicial notice of a statute demonstrating that drug trafficking is an indictable offense in Iowa. We know of no requirement the district court take judicial notice of our own state statutes when making a legal determination, nor has Watt presented any authority for such a requirement. *See One 1985 Cadillac Auto. v. State*, 805 S.W.2d 944, 945 (Tex. App. 1991) (rejecting similar argument).

Moreover, even if it is necessary to take judicial notice of the Iowa statute characterizing marijuana trafficking as an indictable offense, we can do so now. Judicial notice may be taken at any stage of a proceeding. Iowa R. Evid. 5.201(f); *see State v. Freland*, No. 13-0904, 2014 WL 1494953, at *2 (Iowa Ct. App. Apr. 16, 2014) (taking judicial notice of Wisconsin statute on appeal when the "only thing missing from the district court record [was] for the district court to

have judicially noticed the Wisconsin statute that is substantially similar to the Iowa Code section").

We turn to the applicable statutes. Under Iowa Code section 124.401(1),

> [I]t is unlawful for any person to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance . . . or to act with, enter into a common scheme or design with, or conspire with one or more other persons to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance.

Marijuana, for most purposes, is a schedule I controlled substance. *See* Iowa Code § 124.204(4)(m). A violation of section 124.401(1) is, at minimum, a class "D" felony. *See* Iowa Code § 124.401(1)(d). The State's evidence established conduct giving rise to forfeiture under section 809A.3(1)(a).

In addition, Special Agent Mittan testified to his knowledge that it is a felony (depending on the amount) to possess marijuana not only in Iowa, but in Nebraska and Illinois as well. The definition of conduct giving rise to forfeiture includes out-of-state conduct punishable by at least one year in the state where the conduct occurred. Iowa Code § 809A.3(2). But Watt argues the State fell short of its burden under that section because it "did not offer any statutes from any other state identifying specifically what acts are illegal, and what the punishment is for those acts." Watt contends, to determine whether his alleged future acts constitute conduct giving rise to forfeiture, the State had to prove "what acts are illegal in another given jurisdiction, and what the punishment was for those acts." Watt does not cite authority for his contention.

We disagree with his claim the State was required to plead or offer foreign statutes into evidence. The State was not relying on Nebraska or Illinois law as

controlling the forfeiture action being tried. *Contrast Pa. Life Ins. Co. v. Simoni,* 641 N.W.2d 807, 810 (Iowa 2002) (discussing Iowa Rule of Civil Procedure 1.415 where party alleged North Carolina law controlled contract dispute and holding party relying on foreign law may ask the court to take judicial notice of foreign statutory law and may introduce into evidence statutes to prove the foreign law). Instead, the applicable drug statutes from Illinois and Nebraska were facts "not subject to reasonable dispute" in that they were "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Iowa R. Evid. 5.201(b); *Freland*, 2014 WL 1494953, at *2. Accordingly, we now take judicial notice of the drug statutes of those jurisdictions where Watt's currency was intended to facilitate conduct giving rise to forfeiture.

Special Agent Mittan testified, based on his training and experience, one pound of marijuana may be bought for $800 in Colorado and sold for $3200 in Chicago. According to Mittan's calculations, even if Watt spent only half of the $63,803 on marijuana in Colorado, at $800 a pound, Watt would receive almost forty pounds of marijuana. A person possessing forty pounds of marijuana with intent to deliver would be subject to more than one year of imprisonment in Nebraska or Illinois. *See* 720 Ill. Comp. Stat. § 550/5 (West 2013) ("manufacture or delivery of cannabis"); *id.* § 5/5-4.5-25-45 ("sentence"); Neb. Rev. Stat. §§ 28-105(1) (2013) ("felonies-classification of penalties"), 28-405(c)(7) ("controlled substances-marijuana"), 28-416(1)-(2) ("prohibited acts").

The evidence supports a reasonable inference Watt intended to use the seized cash to facilitate an act that was an indictable offense in Iowa or, if the offense occurred outside of Iowa, an act punishable by more than one year of

confinement in Nebraska or Illinois. The district court did not err in finding the State proved the cash was subject to forfeiture.

## B. Presumption

Watt argues the presumption contained in Iowa Code section 809A.12(9) should be treated as a permissive inference due to the quasi-criminal nature of forfeiture proceedings. This interpretation would allow the district court to infer a substantial connection between the currency and the conduct when supported by the evidence but would not place weight on Watt's failure to produce rebutting evidence. Watt contends, if the district court had treated the presumption as a permissive inference, it could not have concluded the cash was subject to forfeiture.

We do not believe it is necessary to decide whether section 809A.12(9) should be read as shifting the burden of proof, because the district court here assumed Watt had rebutted the presumption and ultimately held the State to its burden to prove the necessary connection between the money and the conduct giving rise to forfeiture. The district court properly factored the currency's proximity to the handgun and the small amount of marijuana into its overall sufficiency-of-the-evidence analysis.

## IV. Conclusion

Based on our review of the entire record, and for all of the reasons set forth above, we conclude the evidence presented supports the district court's finding Watt intended to use the seized currency to facilitate conduct giving rise

to forfeiture.  Further, the court did not misapply the presumption in Iowa Code section 809A.12(9).

**AFFIRMED.**

Danilson, C.J., concurs specially; Bower, J., concurs.

**DANILSON, Chief Judge.** (concurring specially)

I specially concur because I agree with the result reached. I believe the amount of cash Watt possessed and the other evidence presented supports the conclusion that his acts were in furtherance of transporting and possessing marijuana with intent to distribute under Iowa law, an offense constituting a class "D" felony. Iowa Code § 124.401(1)(d). I do not subscribe to the majority's acceptance of proof of foreign law solely through the testimony of witnesses or taking judicial notice on appeal. *See* Iowa Code §§ 622.59, .60; Iowa R. Civ. P. 1.415; *Fetters v. Degnan*, 250 N.W.2d 25, 27-28 (Iowa 1977) ("Foreign law must be pleaded and proven." (citation omitted)). Here, the State's answer and resistance did not identify any foreign law and no printed copy of a foreign law was admitted into evidence.